ANN STOTHART and others *v.* HORACE H. HARRISON and others.

April Term, 1878.

EMANCIPATION — LAND HELD IN TRUST FOR A NOMINAL SLAVE. — A conveyance of land to a white man by deed which recites that the conveyance is received for the benefit of a colored man " and a slave," and in trust for him, coupled with proof that the consideration for the land was paid exclusively by the colored man, would be a conclusive and continuous recognition of a trust in favor of the colored man, which would enure to him and his heir, and, upon the subsequent emancipation of the latter, relate back to the accrual of the trust, so as to vest him with title under the act of 1870, ch. 75, and this title could not be affected by the will of the white man, made after the death of the original beneficiary, and which itself only became operative by the death of the testator after the amendment of the Constitution of this state abolishing slavery.

*Williams*, for complainants.
*Haley*, for defendants.

THE CHANCELLOR:— The contest under this bill, filed as long ago as May 18, 1867, is over a house and lot on Deaderick street, in Nashville. Both parties deraign title from a. deed, made on November 10, 1853, by which W. H. Bedford conveyed the lot to John Catron and his heirs, in trust for Willis Stoddart; the deed reciting that the lot had been purchased from Bedford by the said Willis, " a man of color and a slave, the title of whom is in said John Catron, but said Willis has for many years acted for himself, and said Catron receives this conveyance for the benefit of Willis: Stoddart, and in trust for him." The deed shows, moreover, that half the consideration for the lot was paid at the time by Willis, and that he gave two notes, at one and two years, for the residue of the purchase-money. The proof shows: that the first of these notes was paid by Willis in his life-time, and the last by Mary Catron, as Willis's widow, on March 23, 1865, with money received from John Catron, who collected it from a debtor of Willis for land sold to him by Willis. The consideration of the land in dispute was, therefore, paid by Willis, or out of his estate. Willis died intestate, in March, 1862, without children, Mary Catron, with whom he had lived for many years, claiming to be his widow. Mary Catron has died since the commencement of this suit, and the suit has been revived against Margaret Napier and her husband, Elias Napier, the former, by an agreed decree, being described as the " sole devisee " of Mary Catron. The complainants are the widow and children of Jerry Stothart, who died intestate in 1866, and who, the bill alleges, was the sole heir of Willis, being the only surviving child of a deceased sister of Willis. The difficulty in the case grows out of the anomalous *status* of Willis and Mary, both persons of color, nominally slaves, but acting, and being permitted to act, for many years as free persons.

John Catron died in June, 1865. By his will, made on June 27, 1862, he says that he held these two old people,

meaning Willis and Mary, " by a legal title," and " their property as legal owner." He says, further, that the agreement between Willis and Mary in regard to the house and lot in controversy, and the personal property in the house, and the proceeds of the lot sold by Willis to a third person, which were collected by Catron and used in paying for the lot in controversy, was that the survivor should take the property, it having been acquired by their joint labor and earnings. To carry out this intention, he conveys Mary, as his slave, to his three executors named, " to be held and treated at their discretion," and conveys the house and lot in controversy, the personal property and purchase-notes as aforesaid, to the same persons, and a fourth person named, to hold to them in fee, and to the survivors and survivor, in trust " to be appropriated to Mary's use at their discretion," the personal property to be used by her. " My wish is," he adds, in conclusion of this part of his will, " that the property hereby conveyed for Mary's support and use shall be disposed of during her lifetime, or at her death, in such manner as she may direct, by the trustees that may be living at the time the disposition is made." The persons thus designated as trustees are made defendants to this bill, and an answer in their names is among the papers submitted to me, but not marked as filed. This answer repeats the provisions of the will, and sets up no claim to the property except such as may have passed to them under the will.

Whatever personal property Willis died possessed of was, no doubt, as the bill alleges, taken possession of, used, and disposed of by Mary. She has since died, and as neither her personal representative nor any personal representative of Willis is before the court, the controversy is narrowed down to the land.

The proof shows that the deed from Bedford to Catron, conveying to him the land in trust for Willis, was written by Catron himself. That deed distinctly recognizes the fact : that the lot had been purchased by Willis, and paid for by

his money and notes, which notes, the testimony establishes, were paid with Willis's money. The deed, while reciting that Willis was a slave, whose title was in Catron, further states that he had for many years acted for himself, and that Catron receives the conveyance "for the benefit of Willis Stoddart, and in trust for him." The meaning of this language plainly is, that although the title to Willis was in Catron, yet he recognized the fact that he was then, and had been for years, a free man, and the property was his. The working of the institution of slavery, under the laws regulating the *status* of the slave and the free person of color, is still sufficiently in the recollection of most of us to enable us to understand the exact relation of these parties, and why the plan suggested by the deed was resorted to. The slavery was merely nominal, not real, intended to protect the individual from the stringent penal laws bearing upon free persons of color living in this state without any white person to stand for them. If Willis had originally been Catron's slave in reality, and had been emancipated by him, orally or in writing, the property which Willis might acquire would, in strict law, have belonged to Catron; but if Catron recognized Willis's right to the property, no other person could dispute his right. The deed itself to the property was a conclusive and continuous recognition of a trust which, even in the case supposed, would enure to the benefit of Willis, or any person claiming under him, until revoked, even if it were revocable; and the right to enforce the trust, as soon as the emancipation was made complete by act of the state, would, as has been repeatedly decided, relate back to the accrual of the trust itself. *Embry* v. *Morrison*, 1 Tenn. Ch. 436, and cases there cited. The only act of Judge Catron in this case, upon which the idea of revocation can be rested, is the provision of his will already cited. But that will was not written until after Willis's death, when his trust-estate had descended to his heir, who, if Jerry Stothart be his heir, as claimed, was then a free man, capable of taking

and enforcing the trust. Moreover, the will was itself re-vocable, and inchoate, and did not become effective until Catron's death, in June, 1865. But previously, in the month of February, 1865, all slaves were emancipated by the constitutional amendment to that effect, adopted on the 22d of that month. *Johnson* v. *Johnson*, 2 Heisk. 531. In this view, the trust had become absolute in the person entitled, before the will went into effect.

In reality, however, Catron never owned Willis as his slave. The proof is clear that, as early as 1834, Willis bought his freedom from his owner, and that the owner conveyed him, upon a nominal consideration of $10, to another person, upon the express condition that the latter would take the necessary steps to procure the state's consent to his emancipation, or otherwise complete his emancipation. There is no proof that any, even nominal, conveyance was ever made to Catron, and it is obvious that no such conveyance could have vested Catron with the rights of an owner. The bill of sale from the owner was for a special purpose, and there was no title in the conveyee except for that purpose. The recital in Bedford's deed was a mere form for the protection of Willis, and the latter never was even nominally Catron's slave. In this view, the trust was binding upon Catron, without any power on his part to revoke it; and, whether Willis could enforce the trust in a court of law or not, or Willis's heir, until emancipation, Catron had no beneficial interest which he could convey, either to his executors, or the persons named in his will as trustees, or to Mary.

The only interest, therefore, which Mary could take in the land was as widow of Willis. If Jerry Stothart was, as alleged in the bill, the legal heir of Willis, as the only child of Willis's only sister, then the widow would only be entitled to dower for life in one-third of the land, and could convey no interest in the land to her " sole devisee." The proof is entirely conclusive that Willis and Jerry's mother

were brother and sister, born of the same mother, who was a slave, and that Jerry was the only surviving child of the sister. The proof does not show whether the parents of Willis and his sister, or the parents of Jerry, were cohabiting as man and wife at their respective births, nor the contrary. It has been decided by our Supreme Court that a marriage between slaves, with the assent of their owners, whether contracted in common-law form — that is, by agreement and cohabitation — or under our statute, always was a valid marriage in this state. *Andrews* v. *Page*, 3 Heisk. 666. Perhaps, under these circumstances, the presumption would be in favor of a legitimate marriage, the parties having always recognized the relation between them as if it were legitimate. Whether this were so or not, and conceding that the rights of inheritance between the parties depended upon the act of 1870, ch. 75, which expressly provides for the descent of real estate, between that class of persons and their descendants, " agreeable to the laws of descent provided for free persons," the result must be the same. Mary, in her answer, admits what the proof shows, that she was the slave of Catron, and so continued until freed by the operation of the constitutional amendment of 1865. She can, therefore, only take any interest in the property by virtue of the act of 1870, on which she relies in her answer; and the same act conferred the inheritable quality upon the children of Jerry Stothart; and that act was " eminently constitutional and proper " in cases like the present, where the rights of no other person had intervened, by the Statute of Limitations or otherwise. *Andrews* v. *Page*, 3 Heisk. 668.

The complainants are, therefore, entitled to the relief sought; but the costs must be paid by them, or out of the property.